**Udo U. UDO, Plaintiff, Appellant,**

v.

**Henry TOMES, Commissioner for the Department of Mental Health, Defendant, Appellee.**

No. 94–1931.

United States Court of Appeals, First Circuit.

Heard Feb. 7, 1995.

Decided April 28, 1995.

John A. Birknes, Jr., New Bedford, MA, for appellant.

Deborah S. Steenland, Asst. Atty. Gen., with whom Scott Harshbarger, Atty. Gen., Boston, MA, was on brief, for appellee.

Before TORRUELLA, Chief Judge, ALDRICH, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

Plaintiff-appellant Dr. Udo U. Udo challenges his layoff from Taunton State Hospital

("Taunton"), which is operated by the Massachusetts Department of Mental Health ("DMH"). Udo claims that DMH laid him off because of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 626(b), and race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Udo also claims that defendant-appellee Henry Tomes, the Commissioner of DMH, in his individual capacity deprived him of his civil rights in violation of 42 U.S.C. § 1983. The district court granted summary judgment to defendant, and Udo appeals. We affirm.

## I.

### Background

In October 1990, the Massachusetts state legislature directed all state agencies, including DMH, to implement cost-saving measures to address underfunding in the Fiscal Year 1991 budget. DMH responded to this fiscal emergency with a plan that included significant staff reductions. In connection with its state-wide reduction in force, DMH eliminated the two Physician II positions at Taunton, one of which Udo held. At that time, DMH employed a total of nineteen Physician IIs in its various hospitals. Of those, Udo had the most seniority, having been employed since 1975. Udo was also the only Black and, at sixty-five, the oldest of the nineteen Physician IIs employed by DMH.

Tomes notified Udo by letter dated October 12, 1990, that his position at Taunton had been eliminated. In the letter, in accordance with procedures under which senior employees whose positions are eliminated can "bump" less senior employees, Tomes offered Udo certain bumping options. Tomes also notified Udo that he could request an exit interview with the DMH Equal Employment/Affirmative Action Office to determine if any affirmative action rights had been abridged. Although Udo requested such an interview, no interview was ever conducted. Udo elected to bump into the Physician II position at Metropolitan State Hospital, and, on October 26, 1990, Tomes sent Udo a letter indicating that he had been awarded that position.

After awarding Udo the Physician II position at Metropolitan State Hospital, DMH became aware that, as a result of a disciplinary action for malpractice, the Massachusetts Board of Registration in Medicine had, on October 17, 1990, restricted Udo's license to practice medicine to Taunton. Consequently, in a letter dated November 6, 1990, Tomes informed Udo, "Since your election to practice medicine at Metropolitan State Hospital is contrary to this disciplinary action, you are hereby laid-off effective November 17, 1990."

Udo, a member of the Massachusetts Nurses Association ("MNA"), challenged the elimination of his position and his layoff through the grievance process set out in the union's collective bargaining agreement, arguing that those actions violated the collective bargaining agreement and that they were discriminatory in terms of both age and race.[1] The arbitrator found that Udo's layoff violated seniority provisions of the collective bargaining agreement and held that the "decision to lay off [Udo] was arbitrary, capricious and unreasonable and in violation of the contract."[2] The arbitrator did not consider Udo's discrimination claims.

In April 1992, before his arbitration case was concluded, Udo became aware that Taunton had advertised a Physician II position with a posting date of April 16, 1992, and a closing date of April 24, 1992. On May 8, 1992, the MNA notified Taunton that Udo was eligible to be recalled to that position through the collective bargaining agreement, as the agreement provides for recall following layoff at any time within two years. DMH responded that it had rescinded that

---

1. The MNA also pursued an action with the Massachusetts Labor Relations Commission against DMH on behalf of all MNA members who had been laid off or bumped (including Udo) during the state-wide reduction in force, and the Massachusetts Labor Relations Commission found that DMH had violated the collective bargaining agreement.

2. The arbitrator rendered his decision on December 20, 1992, giving the parties ninety days to reach a settlement regarding relief. Because the parties were unable to agree, on June 11, 1993, the arbitrator ordered that Udo be reinstated to his position at Taunton and that he receive partial back pay.

announcement and that the position was no longer available. Udo later found out that the position had been filled by an "03" physician. An 03 physician has the same duties as a Physician II, but does not come within the collective bargaining agreement.

In addition to challenging the elimination of his position and his layoff through his union, Udo filed the instant action. The district court granted defendant's motion for summary judgment, and Udo appeals.

## II.

### Discussion

#### A. Standard of Review

As always, we review a district court's grant of summary judgment *de novo* and, like the district court, review the facts in the light most favorable to the nonmoving party. *See, e.g., Lareau v. Page,* 39 F.3d 384, 387 (1st Cir.1994). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

#### B. Age and Race Discrimination

##### 1. The Legal Framework

In disparate-treatment cases, plaintiffs bear the ultimate burden of proving that they were the victims of intentional discrimination. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, —— ——, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993). When plaintiffs are unable to offer direct proof of their employers' discriminatory animus—as is usually the case and was so here—we allocate the burden of producing evidence according to the now-familiar three-step framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). *See, e.g., Hicks,* —— U.S. at ——, 113 S.Ct. at 2746 (race discrimination); *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 842 (1st Cir.1993) (age discrimination), *cert. denied,* —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994).

Under the *McDonnell Douglas* framework, plaintiffs bear the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. In reduction-in-force cases, the plaintiff establishes the prima facie case by demonstrating that he or she (1) was a member of a protected class, (2) met the employer's legitimate job-performance expectations, (3) was laid off, and (4) that the employer either did not treat members of the protected class neutrally or retained persons not within the protected class in the same position. *See LeBlanc,* 6 F.3d at 842.

Once the plaintiff establishes a prima facie case, a presumption arises that the employer unlawfully discriminated against the plaintiff. *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747; *LeBlanc,* 6 F.3d at 842. This presumption "places upon the defendant the burden of producing an explanation to rebut the prima facie case—i.e., the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). While the burden of production shifts to the defendant during this second step, the burden of persuasion remains on the plaintiff. *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747.

If the defendant "articulate[s] some legitimate, nondiscriminatory reason for the plaintiff's [layoff]," *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824, then the presumption of discrimination established by the plaintiff's prima facie showing "drops out of the picture." *Hicks,* —— U.S. at ——, 113 S.Ct. at 2749. The burden of production then shifts back to the plaintiff, who is given an opportunity to show that the defendant's stated reason for laying off the plaintiff was a pretext for discrimination. *See McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. "The defendant's 'production' (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven 'that the defendant intentionally discriminated against [him].'" *Hicks,* —— U.S. at ——, 113 S.Ct. at 2749 (quoting *Burdine,* 450 U.S. at

253, 101 S.Ct. at 1093) (alterations in *Hicks*); *see also LeBlanc*, 6 F.3d at 843 (applying *Hicks* to age discrimination cases). Thus, once the employer articulates a legitimate, nondiscriminatory reason for laying off the plaintiff, to avoid summary judgment, the plaintiff must introduce sufficient evidence to support two findings: (1) that the employer's articulated reason for laying off the plaintiff is a pretext, and (2) that the true reason is discriminatory. *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 16 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995). While the plaintiff may rely on the same evidence to prove both pretext and discrimination, the evidence must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by discriminatory animus. *Id.*

### 2. Application

■ We shall assume, as the district court did, that Udo established a prima facie case under the *McDonnell Douglas* formulation for both age and race discrimination. As its reason for laying Udo off, DMH points to the restriction on Udo's medical license that made it impossible for him to bump to another hospital.[3] This reason satisfies DMH's burden of production and shifts the burden back to Udo to prove that DMH's proffered reason is a pretext for discrimination.

■ Even assuming *arguendo* that DMH's immediate seizure on the restriction on Udo's license was a pretext for some other reason,[4] in order to survive a motion for summary judgment, Udo's evidence must also allow a jury to find that DMH's articulated reason was a pretext *for discrimination*. *See Smith*, 40 F.3d at 16 ("Title VII

does not grant relief to a plaintiff who has been discharged unfairly, even by the most irrational of managers, unless the facts and circumstances indicate that discriminatory animus was the reason for the decision.").

To establish that he was the victim of race discrimination, Udo presents an MNA document that shows that the nineteen Physician IIs employed by DMH at the time he was laid off comprised eleven Caucasians, six Asians, one Hispanic, and one Black (Udo). Based on this document, Udo maintains that DMH retained all eleven Caucasians, but that it laid off the only Black (Udo), the only Hispanic, and two of the six Asians. DMH responds with the affidavit of Jeff McCue, DMH's Assistant Commissioner for Human Resources. According to McCue, DMH eliminated only two Physician II positions, not four, namely the two positions at Taunton. McCue explains that because neither Udo nor Dr. Pandya, an Asian who held the other Taunton Physician II position, exercised their bumping options, neither of the two least senior Physician IIs, who happened to be a Hispanic and an Asian, were laid off.

Udo also argues that DMH's failure to conduct his requested exit interview to determine whether affirmative action rights pertaining to him were being abridged evidences DMH's discriminatory animus. DMH states that no exit interview was conducted because Udo asked Richard C. Haddocks, Jr., the Director of Human Resources at Taunton, for an exit interview on October 18, 1990, but Haddocks took a medical leave of absence beginning on October 21, 1990, prior to taking action on Udo's request, and did not

---

3. The exact language of the restriction placed on Udo's license is as follows:

> The Respondent [Udo] will restrict his current practice of medicine to Taunton State Hospital and its affiliate programs where he currently practices, *or to those hospitals and their affiliates who are approved by the Board in advance*, and such practice will be monitored by a Board-approved monitoring physician who will report to the Board, on a regular basis, the Respondent's activity and quality of patient care rendered by him.
> (emphasis added).

Although the Board imposed this restriction on Udo's medical license on October 17, 1990, it

stemmed from malpractice occurring before 1980 at St. Luke's Hospital. At Udo's request, on November 28, 1990, the Board changed the restriction to allow Udo to practice at other hospitals and clinics under the jurisdiction of DMH.

4. We note that the arbitrator found Udo's layoff to be "arbitrary, capricious or unreasonable and in violation of the contract." While we, of course, are not bound by the arbitrator's findings, *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 59–60, 94 S.Ct. 1011, 1025, 39 L.Ed.2d 147 (1974), the arbitrator's decision could be considered some evidence of pretext.

return to work until after Udo had been laid off.[5]

As evidence of age discrimination, Udo notes that in June 1990, Haddocks sent him a letter stating that he would have to retire since he turned sixty-five that month. After Udo informed him that he was mistaken and that retirement was not required until age seventy, Haddocks checked further into the matter and informed Udo that he was correct. In his affidavit submitted with defendant's summary judgment motion, Haddocks stated that he wrote the retirement letter because he had received incorrect information from the Massachusetts State Board of Retirement that Udo was subject to mandatory retirement at age sixty-five.

As evidence of both age and race discrimination, Udo also points to DMH's behavior after he applied for a Physician II position at Taunton that was advertised by DMH in April 1992. DMH allegedly responded to Udo's application by stating that the announcement and position had been rescinded, but then later hired an "03" contract physician to fill the position.

We do not think that, given this evidence, a rational jury would be able to find that DMH discriminated against Udo because of his age or his race. That DMH eliminated two positions, which were occupied by a Black and an Asian, does not show that DMH was improperly motivated by age or race when it subsequently laid Udo off. *See Lawrence v. Northrop Corp.*, 980 F.2d 66, 74 n. 13 (1st Cir.1992) ("Nor can the fact that the three oldest associate program managers in Organization 4000 were targeted for layoff itself be viewed as giving rise to an inference of age discrimination."). Similarly, we have trouble understanding how DMH's failure to conduct an exit interview prior to laying Udo

off shows that the decision to lay him off was discriminatory in motive. Nor do we think that the retirement letter Udo received shows age animus on the part of DMH; rather, it seems merely to show that the Massachusetts State Board of Retirement sent DMH incorrect information. *Cf. Mesnick v. General Elec. Co.*, 950 F.2d 816, 826 (1st Cir.1991) ("the intentions of a third party may not be attributed to an employer without some rational basis for attribution"), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992).

We focus in particular on the fact that Udo was not recalled to his position at Taunton. While this tends to indicate that DMH did not want to rehire him, and thus supports the inference that the restriction on his license may have been a pretext, it does not by itself provide a basis for inferring age or race discrimination. That DMH may have violated the collective bargaining agreement yet again when it failed to recall Udo does not indicate that DMH is thereby also liable under Title VII or the ADEA.

Because Udo has not presented evidence that would enable a rational jury to find that he was laid off because of age or race discrimination, we hold that DMH was entitled to summary judgment on Udo's age and race discrimination claims.

## C. Section 1983

Udo also sued Tomes in his individual capacity, claiming that Tomes violated his civil rights by depriving him of employment through an unlawful layoff based on his race, in violation of 42 U.S.C. § 1983. Because, as we held above, Udo failed to raise a triable issue as to whether his layoff was motivated by discriminatory intent, the district court

---

5. Udo also notes that "the affirmative action plan of DMH specifically provides that any layoff action by DMH must be reviewed by the EEO Administrator before it becomes final to determine if such action represents a breakdown in the affirmative action program and therefore calls for remedial action." DMH responds that "[t]he EEO Administrator did in fact review the plan for staff reductions prior to its implementation." Thus, DMH claims that while Udo failed to receive his exit interview, the EEO Administrator had still reviewed his layoff.

Udo points out, however, that the most DMH did was initially review the reduction in force "prior to its implementation," but that this included only the elimination of Udo's Taunton position and not his actual layoff. Udo seems to cite this as evidence that "the layoff should never [have] become final," rather than as evidence of age or race discrimination. While this evidence may constitute proof that DMH violated the collective bargaining agreement, we do not think that it tends to prove that Udo was laid off as the result of age or race discrimination.

properly granted Tomes summary judgment on this claim.

### III.

### *Conclusion*

We hold that Udo failed to create a genuine issue of triable fact on his age and race discrimination claims, and therefore also on his § 1983 claim. Accordingly, defendant was entitled to summary judgment. The judgment of the district court is therefore

*Affirmed.*