**Joel B. SHENKER, Plaintiff,**

v.

**LOCKHEED SANDERS, INC., Defendant.**

**Civil A. No. 92–10924–WJS.**

United States District Court,
D. Massachusetts.

March 20, 1996.

Kevin M. Akre, Salem, MA, for plaintiff.

Douglas K. Mansfield, Casner & Edwards, Boston, MA, for defendant.

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SKINNER, Senior District Judge.

Plaintiff Joel Shenker has filed this action against his former employer Lockheed Sanders, Inc. ("Sanders"), alleging violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 et seq., and a series of supplemental common law tort and contract claims. In my order of April 8, 1994, I denied the defendant's previous motion for summary judgment because I found that there was a genuine issue of material fact as to whether Shenker's release of his ADEA claim was effective. In this motion, Sanders contends that Shenker (1) has failed to make a *prima facie* case under the ADEA, (2) has failed to produce adequate evidence rebutting Lockheed's legitimate, nondiscriminatory reason for the termination, (3) has released all common law claims, and (4) has

failed to demonstrate elements of the common law claims.

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *See, e.g., Gaskell v. Harvard Co-op. Soc.,* 3 F.3d 495 (1st Cir.1993). I have "read the record and indulge[d] all inferences in the light most favorable to the nonmoving party." *See, e.g., Rivera–Ruiz v. Gonzalez–Rivera,* 983 F.2d 332 (1st Cir.1993).

As the motion raises new issues with respect to the ADEA claim, and presents the release issue in a new context, I will summarize the relevant allegations from the record. Shenker was employed by Sanders, a defense contractor, from March 1967 until June 28, 1990, when he was terminated pursuant to a company-wide reduction in force. At the time of termination, Shenker was 48 years old and employed as an "Administrative Specialist" in the Auditing Department of the Controller's Organization of Sander's Operations Division.

Over the spring of 1990, the senior management of the Controller's Organization discussed the need for impending layoffs to reduce the size of the staff from 56 to 42 employees. Shenker alleges that age animus was evident in these discussions. For example, in March 1990, shortly after Shenker had been informally apprised that Controller Barry Breen had mentioned his name as a potential layoff, Shenker alleges that Breen told him that because Shenker was older, he would be better able to bear the financial burden of the firing. *Shenker Dep.* at 117–118, 143–144. Shenker has also presented a document purporting to be the minutes of a meeting on April 11, 1990, in which Breen is supposed to have cautioned his department managers against keeping "older less qualified people" while letting "good young people go." *Plaintiff's Ex. E.*

During the same period, Shenker alleges that he received assurances of job security from Sanders' supervisory personnel. For example, in response to an inquiry whether he was going to be laid off in April, Shenker was informed by Audit Department Manager Hal Hanson that he "was doing fine." *Shenker Dep.* at 38. Shenker also alleges at a subsequent meeting, Hanson told Shenker he "would not be laid off." *Id.* at 52. In early June, Breen informed Shenker that he "was going to be transferred" to the Internal Auditing Department, and that he would be "saved from layoffs." *Id.* at 39–41, 57. Shenker contends he did not apply for other positions at Sanders because he "was under the full understanding that [he] had that job." *Id.* at 76.

On June 28, Shenker was informed that the position in Internal Auditing (actually a department of Sanders' corporate parent, Lockheed Corporation) would not be filled. *Id.* at 79–80. Later that day, Hanson informed Shenker that he was being terminated effective July 6, 1990. *Id.* at 94. Shenker claims he went into "shock," and was not able to discuss the layoff with his wife for several days. *Id.* at 99–105. Shenker was particularly concerned about the imminent loss of health insurance because of recent medical problems with his hip. *Id.* at 99.

On July 2, Shenker met with Human Resources Manager Robert MacPherson. Shenker alleges at this meeting, MacPherson informed Shenker that he was being offered an extra month's severance and health benefits "in consideration for his long-term service." *Id.* at 97–99. Also at this meeting, MacPherson presented Shenker with a letter stating in part, that:

4) By your acceptance of this agreement and in consideration of its benefits, you agree to waive and release any and all claims, complaints or courses of action of any nature that you may have against Lockheed Sanders or any of its officers or employees arising prior to the date of this agreement out of your employment ...

5) By your acceptance of this agreement, you certify that you have read and fully understand all provisions of this agreement and have had an opportunity to discuss this agreement with your attorney, if any, and no representations concerning the terms of this agreement have been made to you by Lockheed Sanders or its agents, other than those terms contained herein.

*Plaintiff's Ex. A.* MacPherson did not inform Shenker during this meeting that acceptance of the agreement would waive legal claims, that he could negotiate the terms of his severance, that he might want to discuss the letter with legal counsel, or that he had the right to extend his group health benefits after termination under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), 29 U.S.C. §§ 1161 *et seq.* *Id.* at 99–105. Shenker believed that in order to obtain the additional severance benefits, he had to assent to the letter by July 5, the date of his "exit" interview. Only after Shenker assented to the severance benefits on July 3, was he informed of his right to extend health benefits under COBRA during his exit interview. *Id.* at 105–106.

## I. ADEA CLAIM

■ In a disparate treatment case, former employees may prove that they were the victims of intentional discrimination either through direct proof of an employer's discriminatory animus, or through the three-step, burden-shifting analysis established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–805, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). *See, e.g., Udo v. Tomes,* 54 F.3d 9, 12 (1st Cir.1995). Shenker has not alleged that he has direct proof of animus. The first step in the *McDonnell Douglas* analysis requires the plaintiff to make out a *prima facie* case of discrimination, creating a presumption that the employer practiced unlawful discrimination. *Udo,* at 12. The second step requires the defendant to articulate a legitimate, nondiscriminatory reason why the adverse employment action was taken; satisfaction of this burden of production eradicates the presumption of discrimination. *Id.* The final step requires the plaintiff to introduce sufficient evidence to support findings that the (1) articulated reason is a pretext, and (2) that the true reason for termination was discriminatory. *Id.* at 13.

■ In the context of a structural reorganization or a company-wide reduction in force, to make out a *prima facie* case under the ADEA, Shenker must demonstrate that (1) he was between 40 and 70 years old, (2) he satisfied Sanders' legitimate job performance expectations, (3) he experienced an adverse employment action, and (4) either "that [Sanders] did not treat age neutrally or that younger persons were retained in the same position." *Woodman v. Haemonetics Corp.,* 51 F.3d 1087, 1091 (1st Cir.1995). This burden is not meant to be "onerous." *See, e.g., Keisling v. SER–Jobs for Progress, Inc.,* 19 F.3d 755, 761 (1st Cir.1994).

There is no dispute that Shenker was a member of the protected class, or that his termination constituted an adverse employment action. Sanders concedes that Shenker's proffer of positive job evaluations, on top of the alleged assertions by Hal Hanson that he was "doing fine" is a sufficient showing that he satisfied expectations to survive summary judgment. *See, e.g., Keisling,* at 760. The real issue is whether Shenker has satisfied the fourth prong.

■ Under circuit precedent, Shenker has two alternatives to make this showing. The first is to demonstrate that Sanders has not treated age "neutrally." Shenker contends that because seven of the fourteen workers who were laid off from the Operations Division were over the age of 40, the termination decisions in the Operations Division were not age neutral. *See MacPherson Aff.* ¶¶ 4, 7. Even assuming that Shenker had personal knowledge of these statistics, his effort to use this "50 percent" figure to infer age discrimination is inadequate. In order to utilize statistics to demonstrate discrimination, there must be a comparison between the number of protected employees in (1) the set of terminated employees, and (2) the pool of employees from which the terminated employees were drawn. Furthermore, there must be a showing that there is a significant discrepancy in the incidence of protected status in the two pools. *Cf. Barnes v. GenCorp Inc.,* 896 F.2d 1457, 1466 (6th Cir.1990) ("the plaintiffs have shown that the results depart significantly from those that chance alone would predict"). To complete his demonstration that older employees in the Operations Division were fired at a disproportionate rate, Shenker has to provide the court with comparative demographic information on the age of employees in the Operations Division which indicates there is a statistically signifi-

cant discrepancy between the 50 percent terminated employee pool and the pre-termination Operations Division personnel, after appropriate regression analysis of non-age factors. *See Connell v. Bank of Boston,* 924 F.2d 1169, 1177 (1st Cir.1991). Shenker has not even come close to meeting this burden. *See LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 844 (1st Cir.1993).

▆▆▆ Having failed to establish lack of neutrality, Shenker must rely on the alternate proposition that "younger persons were retained in the same position." *Woodman,* at 1091. Retention includes both the hiring and reassignment of a younger employee. *See, e.g., LeBlanc,* at 846. Reassignment of a particular title is not determinative; the relevant inquiry concerns the functions which the terminated employee performed in his "position," and what happened to these functions after the termination. *See, e.g., LeBlanc,* at 844 (analyzing position of "AOR" by duties, not title). If Shenker can prove that younger workers were hired or reassigned into positions that carried his duties after the decision to terminate him, he can satisfy the fourth prong. *Cf. Keisling,* at 760 (plaintiff must demonstrate that employer had "a continued need for the same services and skills," not that a replacement was hired). In the context of a reduction in force, the redelegation must involve more than the decision to discontinue certain functions, the assignment of another employee "to perform the plaintiff's duties in addition to [prior] duties," or the "redistribut[ion] among other existing employees already performing related work." *LeBlanc,* at 846. The plaintiff must show that younger employees, who prior to the reduction in force were not performing the primary functions of the plaintiff's job, had these functions transferred to them. Reassignments must be timely with respect to the termination in order to be relevant. *Id.*

▆▆▆ The record indicates that Shenker was something of a utility infielder in the Operations Division. He had many duties, including "audit functions," "quick-reaction administrative support," a "suggestion pro-

gram function," committee work, "certain administrative work," "writing operating instructions," and coordination of the company United Way campaign.[1] Taking Shenker's version of the facts as true, his primary function was to write operating instructions. This function was transferred to an unnamed employee in a "newly-formed group." Shenker has not provided any evidence from which it could be inferred that the employees in the "newly-formed group" were new hires or younger employees.

Accordingly I conclude that the evidence relied upon by Shenker does not establish a *prima facie* case under the ADEA.

I have also considered the statements attributed by Shenker to Controller Breen to determine if, standing alone, they would warrant submitting this case to a jury. Breen was Shenker's immediate superior, who made the decision to fire him.

▆▆▆ The first such statement was alleged by Shenker to have been made when he and Breen were going to play racquetball together in March 1990. According to Shenker, Breen said to him, in connection with general discussion that things were likely to get tough in the company, "You're older. You should be able to bear a layoff better than most people. Your children are grown. They're out of college, and you probably got plenty of money in the bank." This was a stray remark, unrelated to the decisional process and does not make out a direct case for discrimination. *Cf. Woodman,* at 1090 (pattern of such comments by supervisor indicates sufficient animus).

▆▆▆ The second statement attributed to Breen is contained in an unauthenticated and probably inadmissible document entitled "NOTES/ACTION ITEMS FROM QUARTERLY FUNCTIONAL REVIEW—11 APRIL [1990]." *Plaintiff's Ex. E.* This document was allegedly taken from a pile of documents being collated by Hanson, the audit manager. Hanson has submitted an affidavit indicating that he did not write this document and was not present at the meet-

---

1. Coordination of the United Way campaign was transferred to a younger employee, but that was in the fall of 1989, and accordingly is not relevant. *See Shenker Dep.* at 114–115.

ing. There is no evidence to the contrary. The document itself is in two parts. The first is headed "BARRY BREEN'S PRESENTATION", and is followed by a series of indented categories of suggestions, presumably by Breen. The second half of the document is headed "GENERAL COMMENTS:", and contains a number of statements not attributed to anyone. This section has the following second paragraph:

> We must face some hard decisions over qualified people. We may be keeping marginal people and letting good young people go. Don't stay with older less qualified people because of emotional attachments.

There is nothing in the layout of the document which indicates that this statement was made by Breen or any other person with authority to speak on behalf of the defendant. Although plaintiff's attorney has asserted in his memorandum that there are (unidentified) witnesses who would testify that the statement was made by Breen, at summary judgment evidence is required, such as affidavits or depositions of these witnesses. Furthermore, the statement is at best ambiguous, and is more susceptible to the interpretation that the speaker was cautioning against a tendency to favor older employees rather than advocating discrimination against Shenker or other older employees.

In my view neither the relatively innocuous first statement nor the ambiguous and unattributed second statement would warrant a finding of age discrimination by the defendant. Accordingly the defendant's motion for summary judgment is allowed with respect to the claim under the ADEA.

## II. COMMON LAW CLAIMS

The release recites that the law of New Hampshire applies to its validity and interpretation, and New Hampshire was the site of Shenker's employment and of all the significant events in the case. Neither party has asserted any reason why the law of New Hampshire should not apply.

 The release applies to "claims, complaints or courses [sic] of action of any nature that you may have ... arising prior to the date of this agreement ..." Under New Hampshire law (as opposed to federal law), a cause of action "arises" when all of the necessary elements are present. *Bronstein v. GZA GeoEnvironmental*, 140 N.H. 253, 665 A.2d 369, 371 (1995). All of the events which Shenker asserts as the bases of his common law claims occurred prior to July 2, 1990. The release will be enforced unless vitiated by, among other things, intentional misrepresentation. *See, e.g., Bee v. Chicopee Mfg.*, 94 N.H. 478, 55 A.2d 897, 899 (1947). While Shenker's evidence of intentional misrepresentation is scanty and circumstantial, there is probably a kernel of dispute of material fact large enough to defeat summary judgment on that point. That point is, in my view, immaterial, however, because the common law counts of the complaint fail as a matter of substance. Each of these claims arises out of the retraction of Breen's alleged promise to transfer Shenker to the internal auditing department of Lockheed, Sanders' parent corporation.

 This offense is the basis of all four common law counts: promissory estoppel, intentional misrepresentation, negligent misrepresentation and intentional infliction of emotional distress. The first three causes of action all share a common essential element: evidence of reliance by the plaintiff on the defendant's statement to his detriment. Because Shenker is very specific about the nature of his reliance, this case is distinguishable from *Phillips v. Verax Corp.*, 138 N.H. 240, 637 A.2d 906, 911 (1994). In *Phillips*, the plaintiff had acted in reliance on the defendant's promise of continued employment by forebearing to resign and by undertaking extra work. Shenker has not indicated that he refrained from applying for jobs outside Lockheed Sanders. Shenker contends that his reliance consists of a decision not to apply for two administrative vacancies within the company. The two officials responsible for filling those vacancies have testified by affidavit that Shenker was not qualified for either job because he had no skill with the use of a computer, which was an essential component of these positions. Shenker offers nothing to substantiate a contrary position but his own bald assertion that he was qualified. The detriment allegedly

accruing to Shenker as a result of his purported reliance was in fact illusory, and thus insufficient to sustain these causes of action.

Shenker's claims for emotional distress are barred by the New Hampshire Workers' statute. N.H.Rev.Stat.Ann. § 281–A:8 (Supp.1983). Emotional distress, including emotional distress resulting from job termination, is deemed a personal injury compensated under that statutory scheme, and hence not a cause of action available at common law. *See, e.g., Censullo v. Brenka Video,* 989 F.2d 40 (1st Cir.1993); *Kopf v. Chloride Power Electronics, Inc.,* 882 F.Supp. 1183, 1190–91 (D.N.H.1995).

## III. CONCLUSION

Sanders' motion for summary judgment is allowed with respect to all of the counts of the complaint. Judgment for the defendant shall enter forthwith.