UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 96-1618
No. 96-1663

LORI-ANN MOLLOY,

Plaintiff, Appellee,

v.

WESLEY BLANCHARD, ETC., ET AL.,

Defendants, Appellants.



APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Raymond J. Pettine, U.S. District Judge] 



Before

Cyr, Circuit Judge, 

Campbell, Senior Circuit Judge, 

and Stahl, Circuit Judge. 



Kathleen M. Powers, with whom Marc DeSisto and DeSisto Law 
Offices were on brief for appellants. 
Ina P. Schiff for appellee. 


June 10, 1997


CAMPBELL, Senior Circuit Judge. The former Chief 

of Police and the City of Warwick, Rhode Island, appeal from

a judgment against them in the district court entered on the

jury's verdict in favor of a Warwick police officer.1

Plaintiff had alleged, inter alia, that she was treated 

disparately because of her gender and that her constitutional

right to procedural due process was violated when the Chief

suspended her without holding a hearing as required by state

law. We affirm.

I.

We state the facts in the light most favorable to

the verdict. See Ferragamo v. Chubb Life Ins. Co. of Am., 94 

F.3d 26, 27 n.1 (1st Cir. 1996).

Plaintiff, Lori Ann Molloy, a police officer for

the City of Warwick, Rhode Island, was suspended by Chief of

Police Wesley Blanchard, on June 3, 1994. The suspension

resulted from her ostensible refusal to cooperate with the

state police in their investigation of a triple homicide

involving Robert Sabetta, a police officer from the Town of

Foster, Rhode Island. 

Before Molloy joined the Warwick police department

in 1991, she and Sabetta were in the same class at the police

academy. After the police academy, Molloy had little contact

 

1. Cf. Molloy v. Blanchard, 907 F. Supp. 46 (D.R.I. 1995) 
(granting in part and denying in part the defendants' motion
for summary judgment).

-2- 2

with Sabetta until 1993. In February 1993, Molloy spent an

evening socializing with Sabetta and Paula Duffy, another

police academy classmate and a police officer in Cranston,

Rhode Island. During that evening, Sabetta showed Molloy and

Duffy his personal firearm, a semiautomatic with a laser

sight.

Molloy saw Sabetta again approximately two weeks

later. Duffy, with Sabetta in the car, drove to Molloy's

home to show Molloy her new Jeep. The three then went to a

nearby restaurant for pizza and beer. During the meal,

Sabetta complained about his suspension for improper use of

force. He commented that perhaps he should have killed, or

should kill, the people whose complaints had resulted in his

suspension.

On April 13, 1993, Sabetta shot and killed three

teenage boys and injured a fourth. Among the victims were

persons who had filed brutality complaints against him. The

injured victim identified Sabetta as the shooter. Molloy

learned about the murders and Sabetta's involvement during

her midnight to 8:00 a.m. shift on April 14, 1993. Molloy

told her sergeant about knowing Sabetta from having attended

the police academy with him. 

Later that morning, Duffy contacted Molloy, worried

that Sabetta might come to Duffy's home. At Molloy's

suggestion, Duffy arranged to spend the night at the house of

-3- 3

her friend Suzanne Jardine, also a Cranston police officer.

Molloy stopped by Jardine's home after her duty shift. When

the Sabetta matter was broached, Duffy stated that talking

about the shootings upset her too much and that she did not

want to discuss them further. Molloy acceded to her request.

During their investigation, the Rhode Island state

police contacted Molloy in June 1993 to ask her some general

questions about Sabetta. Molloy did not volunteer that

Sabetta had said either he should have killed or should kill

the people who had filed a brutality complaint against him,

nor did she mention knowing that Sabetta owned a

semiautomatic with a laser sight. The murder weapon had been

Sabetta's service revolver, not a semiautomatic.

After the Sabetta murder trial began the following

summer, the state police received an anonymous letter

claiming that a Warwick police dispatcher and a Cranston

police officer possessed information relevant to Sabetta's

prosecution. This led the state police to interview Molloy

on June 2, 1994. At this interview Molloy revealed her two

meetings with Sabetta, his comments about the people who had

complained about his brutality, and his ownership of the

laser sighted semiautomatic.

Not satisfied with the information Molloy had

supplied, the state police asked her to report to their

barracks for a third interview the following morning. During

-4- 4

this session, Molloy told the state police about her visit

with Duffy after the triple homicide. The police pressed

Molloy for additional information, but Molloy denied having

any.

The state police called Chief Blanchard, told him

that Molloy was refusing to cooperate with them, and asked

him to come down to their barracks to speak with her. The

Chief prepared a letter of suspension and then drove to the

state police barracks with Deputy Chief Stephen Castiglioni

and Captain Thomas K. Wilson. 

After he arrived at the state police barracks, the

Chief met with several investigators who accused Molloy of

conspiring with Duffy to withhold information about the

murders. The Chief then met with Molloy and, without asking

for her side of the story, advised her to cooperate with the

state police investigation. When she insisted she had told

the state police all she knew, the Chief handed her the

letter of suspension and told her she was suspended with pay

until the state police concluded their investigation into her

alleged conspiracy with Duffy. The Chief also barred her

from participating in training activities and from entering

the police headquarters building.

Molloy remained on suspension for nine and a half

weeks. While suspended she received her salary, but she lost

the opportunity to work extra shifts, to participate in

-5- 5

training sessions, and to work on special details, all

activities which would have provided additional pay. While

suspended, Molloy suffered emotional distress and damage to

her personal and professional reputations. On several

occasions during her suspension, Molloy was required while

testifying as a witness in connection with arrests she had

made before her suspension to explain in open court why she

had been suspended.

On June 9, 1994, approximately a week after her

suspension, Molloy, with the help of her attorney, requested

a hearing concerning her suspension pursuant to the Rhode

Island Law Enforcement Officers' Bill of Rights, R.I. Gen.

Laws 42-28.6-13(C) ("the Officers' Bill of Rights").2 The

 

2. Although it has since been amended, see 1995 R.I. Pub. 
Laws ch. 19, 1, at the time of Molloy's suspension, R.I.
Gen. Laws 42-28.6-13(C) stated:

Emergency suspension may be imposed by the chief or the
highest ranking officer of the law enforcement agency,
when it appears that such action is in the best
interest of the public. Any emergency suspension of
any law enforcement officer shall consist of the law
enforcement officer being relieved of duty and he or
she shall receive all ordinary pay and benefits as he
or she would have if he or she were not suspended. Any
law enforcement officer so suspended shall be entitled
to a prompt hearing before a hearing committee upon his
or her request. The time period for the hearing is not
to exceed fourteen (14) days. If, after hearing, the
hearing committee does suspend or dismiss the law
enforcement officer, he or she shall not be entitled to
his or her pay and benefits; however, if the
enforcement officer is reinstated by a subsequent
hearing, he or she shall be entitled to be reimbursed
for all salary and benefits that have not been paid.

-6- 6

Chief had met with the City Solicitor, William Smith, the day

before. The Chief testified Smith had advised him that he

did not need to specify any charges against Molloy or afford

her a hearing so long as Molloy was receiving full pay and

benefits.3 The Chief did not charge Molloy, nor was he

willing to grant her the hearing required by the Officers'

Bill of Rights.

Molloy filed a mandamus action in the Rhode Island

Superior Court under R.I. Gen. Laws 42-28.6-14(2).4 The

Chief never answered Molloy's state court complaint. In

August 1994, the Chief reinstated her, reserving the right to

file disciplinary charges upon the completion of the state

police investigation. Her reinstatement rendered her state

court mandamus action moot. In September 1994, the Attorney

General informed the Chief that no criminal charges would be

filed against Molloy.

 

3. In contrast, Smith testified he told the Chief to put
Molloy on "administrative leave status" and specifically
advised him not to suspend Molloy under the emergency
suspension provision of the Officers' Bill of Rights, R.I.
Gen. Laws 42-28.6-13(C), because that provision did not
apply to Molloy's case.

4. R.I. Gen. Laws 42-28.6-14(2) states:

Any law enforcement officer who is denied any right
afforded by this subtitle may apply, either
individually or through his or her certified or
recognized employee organization, to the superior court
where he or she resides or is regularly employed for
any order directing the law enforcement agency to show
cause why the right should not be afforded.

-7- 7

On September 30, 1994, Molloy filed an eight-count5

complaint against the City of Warwick, the Chief, Warwick's

Board of Public Safety, and Mayor Lincoln Chafee. Under 42

U.S.C. 1983,6 Molloy alleged she had been deprived of her

constitutional rights to equal protection, free speech, and

substantive and procedural due process. Under Title VII of

the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., 

Molloy claimed disparate treatment because of her gender and

disparate impact because of policies having a disparate

negative impact on her as a woman. Under state law, Molloy

alleged discrimination and the negligent or intentional

infliction of emotional distress.

Before trial, the district court dismissed, on

grounds of qualified immunity, Molloy's claims for

substantive and procedural due process violations against

Mayor Chafee and her claim for a substantive due process

violation against the Chief. The trial then proceeded. At

 

5. The complaint actually states nine counts, though two are
labeled "VIII." However, the first two counts are apparently
identical.

6. 42 U.S.C. 1983 states, in relevant part:

Every person who, under color of any statute,
ordinance, regulation, custom, or usage, of any State
or Territory or the District of Columbia, subjects, or
causes to be subjected, any citizen of the United
States or other person within the jurisdiction thereof
to the deprivation of any rights, privileges, or
immunities secured by the Constitution and laws, shall
be liable to the party injured in an action at law,
suit in equity, or other proper proceeding for redress.

-8- 8

the close of all the evidence, the court granted judgment as

a matter of law for all the defendants on Molloy's disparate

impact and First Amendment claims. The court also granted

judgment as a matter of law for Molloy on her procedural due

process claim, submitting her gender discrimination claim to

the jury. The jury was also instructed to ascertain damages

on both claims.7

The jury determined that Molloy had been

discriminated against on the basis of her gender. It awarded

her $23,000 in damages on the discrimination claim as well as

for violation of procedural due process as earlier found by

the court. The district court denied Defendants' post-

verdict motions for judgment as a matter of law, for a new

trial, and to alter judgment. Defendants appealed.

II.

We turn first to Defendants' contention that the

district court committed error in granting judgment as a

matter of law against Defendants and in Plaintiff's favor on

the procedural due process claim. This is a close question.

Given, however, our affirmance, infra, of the jury's verdict 

for Plaintiff on her Title VII claim for gender

discrimination, there is no practical need to address it;

however resolved, the outcome would not affect the damages

 

7. The remaining claims appear to have been dropped and, in
any event, are not at issue in this appeal.

-9- 9

awarded to Plaintiff. The jury provided a single damages

award for both claims, and so long as Plaintiff is found

entitled to have prevailed on either of the two claims, the

award stands, with no alteration in the amount of damages

regardless of whether one or both claims are upheld. The

same conduct underlay both: the Chief's suspension of Molloy

while depriving her of the hearing called for by the

Officers' Bill of Rights. Her damages consisted in each

instance of her lost opportunity to earn extra income while

suspended (for special details, overtime, etc.) and her

emotional distress and loss of reputation caused by her

suspension. The special verdict form handed to the jury by

the court instructed the jury to award a single amount of

damages even if it found (as the jury reported it did)

liability and causation under both of Molloy's legal

theories.8 We also note that the district court's final

judgment, which we affirm, infra, does not mention the 

underlying legal theories but only states a finding of

liability and the amount of damages. 

Because the jury's damages award would be the same

under either or both liability theories, and because we find

there was sufficient evidence to support the jury's finding

 

8. Although liability under Molloy's procedural due process
claim had been directed by the court, the causation
determination under that theory was left to the jury, as were
damages.

-10- 10

of gender discrimination, infra, we need make no 

determination as to whether or not the court erred in

granting judgment to Plaintiff as a matter of law on her

constitutional claim of a violation of procedural due

process.9 Cf. Gulf Oil Co. v. Bernard, 452 U.S. 89, 99 

(1981) ("[P]rior to reaching any constitutional questions,

federal courts must consider nonconstitutional grounds for

decision."). 

Our analysis has the effect of mooting the district

court's holding as to the due process claim, leaving that

ruling without legal effect. Cf. Cardinal Chem. Co. v. 

Morton Int'l, Inc., 508 U.S. 83, 93-95 (1993) (recognizing 

that in patent infringement cases, a finding of non-

infringement prevents a court from reaching an affirmative

defense asserting the patent's invalidity because the

validity issue becomes "immaterial to the disposition of the

case," and that any determination of the patent's validity by

the district court in such a case should be vacated) (citing

Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241 

(1939)). 

 

9. For the same reasons, we also do not reach the City's
claim that it is not liable for the Chief's actions under 
1983. The City does not contest respondeat superior
liability under Title VII. See Randle v. City of Aurora, 69 
F.3d 441, 450 (10th Cir. 1995); Hamilton v. Rodgers, 791 F.2d 
439, 444 (5th Cir. 1986); Scott v. City of Topeka Police & 
Fire Civil Serv. Comm'n, 739 F.Supp. 1434, 1438 (D. Kan. 
1990).

-11- 11

III.

We turn next to Defendants' assertion that there

was insufficient evidence to support the jury's verdict in

Plaintiff's favor on the sex discrimination claim. Title VII

makes it unlawful for an employer "to fail or refuse to hire

or to discharge any individual, or otherwise to discriminate

against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of

such individual's race, color, religion, sex, or national

origin." 42 U.S.C. 2000e-2(a)(1).

In a Title VII disparate treatment case, if, as is

often true, see Smith v. Stratus Computer, Inc., 40 F.3d 11, 

15 (1st Cir. 1994), cert. denied, 115 S. Ct. 1958 (1995), the 

plaintiff has no direct proof of deliberate discrimination,

"the plaintiff must make out a prima facie case of

discrimination, the employer must then come forward with some

non-discriminatory justification, and the plaintiff finally

is given the opportunity to convince the trier of fact that

the justification was pretextual and that the real reason was

discriminatory." Cuello-Suarez v. Puerto Rico Elec. Power 

Auth., 988 F.2d 275, 278 (1st Cir. 1993).  

For the prima facie case, a disparate impact

plaintiff must "identify and relate specific instances where

persons situated similarly 'in all relevant aspects' were

treated differently." Dartmouth Review v. Dartmouth College, 

-12- 12

889 F.2d 13, 19 (1st Cir. 1989) (quoting Smith v. Monsanto 

Chem. Co., 770 F.2d 719, 723 (8th Cir. 1985), cert. denied, 

475 U.S. 1050 (1986)). "The test is whether a prudent

person, looking objectively at the incidents, would think

them roughly equivalent and the protagonists similarly

situated." Id. "Exact correlation is neither likely nor 

necessary, but the cases must be fair congeners. In other

words, apples should be compared to apples." Id. 

The defendants contend that Molloy failed to

establish a prima facie case by establishing that "similarly

situated" males received more lenient treatment in respect to

suspension. We disagree.

At trial, the Chief himself testified that in

approximately a dozen discipline cases involving Warwick

police officers who were male,10 the Chief had afforded the

officers the rights created by the Officers' Bill of Rights,

as he conspicuously would not do for Molloy, a woman.

Moreover, in a number of these cases he kept officers on

active duty after learning that they were suspected of highly

questionable behavior. 

Scott Hornoff, for example, was the primary suspect

in the state police investigation of the 1989 murder of a

woman named Victoria Cushman. Although the Chief knew as of

 

10. The Chief also briefly referred to a situation involving
a woman officer, but she was not identified, and the details
of her case remain unclear.

-13- 13

October 1991 that Hornoff was the main suspect, he did not

suspend him as he later did Molloy but instead kept him on

active duty working at an administrative job. Hornoff was

not suspended until he was eventually indicted for murder by

a grand jury in December 1994. It was conceded, moreover,

that Hornoff's rights under the Law Enforcement Officers'

Bill of Rights were recognized.

Joseph Duquette, a senior Warwick police officer at

the time of the Cushman case, interfered with the state

police investigation of Hornoff. In 1993, Duquette issued a

memorandum in which he ordered the members of the Warwick

Major Crimes Unit not to discuss the Cushman investigation

with anyone from the state attorney general's office unless

such a discussion took place pursuant to a subpoena or with

the explicit permission of Duquette, then-Commander

Castiglioni or Chief Blanchard. Duquette was not disciplined

in any way for his interference with the state police

investigation until August of 1995, after Chief Blanchard had

been replaced by Chief DeFeo. While Appellants argue that

the Chief was unaware of Duquette's activity, we find

sufficient evidence in the record from which the jury could

have properly inferred knowledge.

We conclude that Molloy presented evidence

sufficient for the jury to have found that she had

-14- 14

established her prima facie case that "similarly situated"

males had received dissimilar treatment.

The defendants go on to argue that even if the

conduct of the disciplined male officers was sufficiently

similar in material respects to Molloy's to establish a prima

facie case, the weight of the evidence was insufficient to

support a finding "that the justification [offered by the

defendants] was pretextual and that the real reason was

discriminatory." Cuello-Suarez, 988 F.2d at 278. 

Presented with the evidence of cases such as

Hornoff's and Duquette's in which male police officers who

had committed similar or more severe offenses than those

Molloy was accused of were either not disciplined or, if

disciplined, were first afforded their rights under the

Officers' Bill of Rights, the jury was entitled to infer that

the Chief's proffered explanation for his more harsh

treatment of Molloy the state police's advice that she was

refusing to cooperate with them and the ostensible advice

that the granting of rights was unnecessary where, although

suspended, she was still being paid was a pretext. 

Essentially the same evidence also allowed a

reasonable jury to conclude that the plaintiff had carried

her burden of proving that the Chief had discriminated

against Molloy because of her gender in violation of Title

VII. See Udo v. Tomes, 54 F.3d 9, 13 (1st Cir. 1995) 

-15- 15

(holding that a plaintiff may rely on the same evidence to

prove both pretext and discrimination). Molloy was suspended

without being offered the same rights granted to similarly

situated male officers. Moreover, the reasons supplied by

the Chief for his refusal to provide Molloy with a hearing

were so flimsy as to permit a finding of mendacity:

The factfinder's disbelief of the reasons
put forward by the defendant
(particularly if disbelief is accompanied
by a suspicion of mendacity) may,
together with the elements of the prima
facie case, suffice to show intentional
discrimination. Thus, rejection of the
defendant's proffered reasons will permit 
the trier of fact to infer the ultimate
fact of intentional discrimination . . .
.

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993). 

See also Woods v. Friction Materials, Inc., 30 F.3d 255, 260- 

61 n.3 (1st Cir. 1994); LeBlanc v. Great Am. Ins. Co., 6 F.3d 

836, 843 (1st Cir. 1993), cert. denied, 511 U.S. 1018 (1994). 

The Chief was experienced in matters arising under the

Officers' Bill of Rights, yet he refused to grant Plaintiff

her rights even after, with the assistance of an attorney and

a union representative, she had requested a hearing. The

Chief said that he had refused to grant Molloy a hearing

because the City Solicitor had told him no hearing was

required. Yet the statutory language seems utterly clear

that a hearing was required in this case. See R.I. Gen. Laws 

42-28.6-13(C) ("Any law enforcement officer so suspended

-16- 16

shall be entitled to a prompt hearing before a hearing

committee upon his or her request."). The Chief's outright

refusal was in marked contrast to his regular allowance of

these rights to male officers. We hold that the jury had

sufficient evidence from which to infer discriminatory

intent. 

IV.

The defendants' remaining contentions are not

persuasive. First, they argue that the district court made

certain errors in admitting evidence at trial. Our review of

the record satisfies us that such errors, if any, were

harmless. See Lataille v. Ponte, 754 F.2d 33, 37 (1st Cir. 

1985) ("Our standard for determining whether the admission of

such evidence is harmless error is whether we can say 'with

fair assurance . . . that the judgment was not substantially

swayed by the error . . . .'") (quoting United States v. 

Pisari, 636 F.2d 855, 859 (1st Cir. 1981) (quoting Kotteakos 

v. United States, 328 U.S. 750, 765 (1946))). 

Defendants protest that there was insufficient

evidence to allow a reasonable jury to award $23,000 in

damages, pointing out that Molloy could not have lost more

than $5,000 in overtime, training, detail work and the like.

They acknowledge that the jury may have granted all or some

of the remaining damages to compensate for Molloy's emotional

distress, but insist that since there were other potential

-17- 17

causes of Molloy's distress, such as the state police

interrogation and her worries about possible criminal

prosecution, expert testimony was essential to establish what

portion of her distress came from her suspension. They cite

Andrade v. Jamestown Hous. Auth., 82 F.3d 1179, 1187-88 (1st 

Cir. 1996), as holding that where there is more than one

possible cause of a plaintiff's emotional distress, expert

testimony is required to establish that it was the

defendant's conduct that caused the plaintiff's symptoms and

not some other factor.

The defendants misstate our holding in Andrade. In 

that case, the plaintiff had a previous history of stomach

problems, headaches, and diarrhea. We held that medical

testimony was required for the plaintiff to prove that the

irritated bowels, diarrhea, tension headaches and

sleeplessness she experienced were the result of emotional

distress caused by the defendant and not merely a

continuation of her previous medical problems. In that case,

we sought to avoid putting juries in the position of

evaluating the effect of a preexisting medical condition

without the aid of expert medical testimony. We stated,

"[W]e are not establishing a bright-line rule that expert

testimony is always necessary to prove the causation prong of

[intentional infliction of emotional distress]. There may

very well be situations where causation is within the common

-18- 18

knowledge and experience of the layperson . . . ." Id. at 

1188 n.5.

This is such a case. There is no contention that

Molloy's asserted anxiety, nervousness, nausea and

sleeplessness derived from a preexisting medical condition.

The sole issue was the role of Defendants' conduct in

producing those symptoms and the placing of a fair monetary

valuation on them relative to the circumstances of this case.

The jury heard and could evaluate her testimony describing

what effect the suspension had upon her as compared with

other events. It is unclear how an expert could have helped.

This is the kind of determination typically entrusted to

juries.

Besides emotional distress, Molloy also testified

that the defendants' actions caused her to suffer damage to

her personal and professional reputations. She stated that

her suspension, related as it was to Sabetta's murder trial,

received substantial publicity. Also, during her suspension

Molloy testified as a witness at several trials in connection

with arrests she had made previously. At these trials, she

had to admit in open court that she was then suspended and

was obliged to describe the circumstances surrounding her

suspension. The jury was entitled to compensate Molloy for

these additional elements of damage.

The judgment is affirmed. Costs to appellee. 

-19- 19